-For Publication-

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THE DILLE FAMILY TRUST,** <br> Plaintiff, | **CIVIL ACTION** |
| v. | |
| **THE NOWLAN FAMILY TRUST,** <br> Defendant. | **NO. 15-6231** |

## OPINION

     This case is the latest installment in a decades-long dispute over the intellectual property rights to Buck Rogers, a science-fiction character created in the 1920s. In the current iteration of the conflict, Plaintiff the Dille Family Trust has appealed a ruling of the U.S. Trademark Trial and Appeal Board ("TTAB") rejecting its opposition to the registration of the BUCK ROGERS mark by Defendant the Nowlan Family Trust. Plaintiff has also asserted claims for breach of contract (a settlement agreement relating to an earlier chapter of the dispute); confusion, deception, and false description under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); trademark dilution under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); and claims for trademark infringement, unfair competition, and interference under Pennsylvania law, 54 Pa. Cons. Stat. §§ 1123-1124. Defendant has filed a motion to dismiss all claims except the TTAB appeal. That motion shall be granted in part and denied in part.

**I.    BACKGROUND**

     The Buck Rogers character made its newspaper comic strip debut in 1929, having been developed for that format by Philip Francis Nowlan, under a contract with John F. Dille's

1

National Newspaper Service.  Throughout the 1930s, Buck Rogers continued to appear in newspapers, and later expanded to radio programs and a motion picture series.

After Philip Francis Nowlan died in 1940, his estate, administered by his wife Theresa Marie Nowlan, filed a federal lawsuit in Illinois against John F. Dille, the John F. Dille Company, and others disputing intellectual property rights associated with the Buck Rogers character.  The claim was settled in 1942 when Theresa Marie Nowlan signed a "Full and Complete Release and Assignment" (the "1942 Release") releasing all claims that "Philip Francis Nowlan or I have had, now have, or may have in the future, or which my heirs, executors, or administrators hereafter can, shall or may have," against any of the parties to the suit, including the rights to receipts from "newspaper strips, merchandise, radio, movies, and all other subject matter."  Second Am. Comp. ("SAC") Ex. A at 2.  In a separate paragraph, the 1942 Release also provided that:

> The party of the first part hereby assigns, releases, waives and conveys all claims, rights and interests of any kind whatsoever in and to all copyrights to John F. Dille Co., and in and to all trade-marks, good will, titles including specifically "Buck Rogers" and "Buck Rogers In The 25th Century" and all characters, patents and inventions and all other subject matter relating in any way to the Buck Rogers features to John F. Dille.

SAC Ex. A at 3.  In exchange for these releases, Theresa Marie Nowlan, as executrix of her husband's estate, received a payment of $1,750 on behalf of all the defendants in the lawsuit.  Plaintiff alleges that through a series of assignments, successions, and contracts, Plaintiff stands in the shoes of John F. Dille for the purposes of the rights assigned in the 1942 Release and that Defendant, the Nowlan Family Trust, is the legal successor to Theresa Marie Nowlan and Philip Francis Nowlan, and thus now stands in the shoes of Theresa Marie Nowlan for the purposes of the 1942 Release.

In January 2009, 67 years after that release was signed, the Nowlan Family Trust filed an intent-to-use application to register the trademark BUCK ROGERS (the "Defendant's Trademark Application"). Later in 2009, Plaintiff filed two applications of its own seeking to newly register the BUCK ROGERS mark (the "Plaintiff's Trademark Applications"), even though it already held registrations in the mark dating to the 1980s. In April 2011, Plaintiff's decades-old registrations of the BUCK ROGERS mark were cancelled.[1] Three months later, Plaintiff filed an opposition to Defendant's Trademark Application with the TTAB (the "TTAB Opposition"). The asserted basis of Plaintiff's Opposition was that, notwithstanding the cancellation of its own registration of the BUCK ROGERS mark, Plaintiff has continued to license the mark for use on various products and services on an ongoing basis since 1929, and specifically from at least 2003 through the present, including DVD sets, an action figure and statue, die cast models of a Buck Rogers "Floor Flyer Spaceship," an eight-volume republication of original comic strips, a comic book series, a music soundtrack, art posters, clothing, and a novella. In addition to this ongoing production of merchandise, Plaintiff has noted that at least 30 Buck Rogers-related objects have been displayed as part of the permanent collection at the Smithsonian Institution in Washington, D.C. After briefing and oral argument, the TTAB dismissed Plaintiff's Opposition on September 25, 2015, based primarily on a lack of evidence connecting the trademark's pre-1942 chain of title to the current parties in this case.

In December 2015, Tony Krantz ("Krantz"), who Plaintiff alleges is an agent of the Nowlan Family Trust, met with representatives of the Sy-Fy Network ("Sy-Fy") in Los Angeles, California to pitch a "Buck Rogers" pilot script and "series bible" (a written guide setting forth characters and descriptions) for use in a television series or movie project and associated merchandising. In the course of the meeting, Krantz allegedly asserted that Defendant was the

---

[1] The SAC does not indicate the current status of Plaintiff's 2009 applications to register the mark.

owner of the BUCK ROGERS mark and could lawfully license the materials to Sy-Fy.  Plaintiff alleges that other similar meetings were scheduled with at least two other potential buyers for the script in 2015, although there is no assertion that those meetings actually took place.

## II.     LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "In light of *Twombly*, it is no longer sufficient to allege mere elements of a cause of action; instead a complaint must allege facts suggestive of the proscribed conduct."  *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 177 (3d Cir. 2010) (internal quotation marks and brackets omitted).  A plaintiff need not show that success on his or her claims is probable, but must assert "'enough facts to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element in a claim.  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).  However, "'[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'"  *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).  The question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529-30 (2011) (internal quotation marks and citations omitted).

In considering a plaintiff's claims, the Court must construe the facts alleged in the Complaint drawing all reasonable inferences in the light most favorable to the plaintiff. *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 290 (3d Cir. 2014).  In doing so, the Court may look to documents that are attached to the

complaint and on which a plaintiff relies to determine if the documents support or contradict the legal or factual claims in the complaint. *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 427 (3d Cir. 1999).

## III. DISCUSSION

### A. Breach of Contract

Plaintiff alleges that Defendant's pitch of the Buck Rogers script and series bible to Sy-Fy in December 2015 breached the 1942 Release because it constituted an assertion of rights in the Buck Rogers character – the precise rights that Plaintiff claims were released by Defendant's predecessor in 1942. While not conceding that the 1942 Release was ever breached, Defendant argues that if a breach did occur, Plaintiff's claim is barred by Pennsylvania's four-year statute of limitations for written contract claims because it accrued when Defendant asserted its trademark rights by applying for the BUCK ROGERS mark in 2009 (which application Plaintiff discovered no later than July 2011 when it filed its TTAB Opposition).

#### 1. Statute of Limitations

Pennsylvania's four-year statute of limitations on written contract claims applies here. 42 Pa. Cons. Stat. § 5525(a)(8); *see Stephens v. Clash*, 796 F.3d 281, 289 (3d Cir. 2015) (noting that federal courts adjudicating state law claims apply statutes of limitations according to the law of the state in which the court sits).[2] Plaintiff's original Complaint was filed on November 19, 2015, and thus its contract claim cannot survive if it accrued more than four years prior to that date (*i.e.*, before November 19, 2011).

In the Third Circuit, a statute of limitations argument may warrant dismissal of a claim at the motion to dismiss stage "only if the time alleged in the statement of a claim shows that the

---

[2] *See* April 21, 2016 Order granting Defendant's first motion to dismiss (ECF No. 28).

5

cause of action has not been brought within the statute of limitations." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (internal quotation marks omitted). If the expiration of the limitation period "is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Id.*

Plaintiff has alleged a breach of contract occurring in December 2015 – well within the statute of limitations. While Defendant argues that the original breach actually occurred in 2009 when Defendant's Trademark Application was filed, it is not apparent from the face of the SAC that this action breached the 1942 Release, or that if it did, that the breach was the same as the alleged breach associated with pitching the script to Sy-Fy in 2015. Resolving the true nature and timing of the breach will require the development of a more complete evidentiary record. Accordingly, Plaintiff's breach of contract claim cannot be dismissed as time barred at this stage.[3]

### 2. Substantive Breach

Defendant also argues that its pitch of a Buck Rogers script to Sy-Fy was not a breach of the 1942 Release in the first place because, Defendant contends, the portion of the release concerning the Buck Rogers trademark applied only to Theresa Marie Nowlan herself, and not to her "heirs, executors, or administrators." Since the 1942 Release was attached to the SAC and Plaintiff's claim is based on that document, the Court may consider the language of the 1942 Release itself to determine whether the allegations of the SAC plausibly support Plaintiff's claim. *See S. Cross Overseas Agencies*, 181 F.3d at 427.

---

[3] Plaintiff has also argued that, even if the 1942 Release was breached in 2009, the continuing violations doctrine should be applied to measure the statute of limitations from the more recent breach. This argument is without legal merit. The continuing violations doctrine is applied most frequently in the context of employment discrimination law to allow plaintiffs to include all instances of harassment in a hostile work environment claim, even if the initial acts occurred outside the statute of limitations. *See Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001). While the Third Circuit has acknowledged that the doctrine has some application to other torts, *see id.*, it has not expanded its reach to contract claims and, absent binding precedent to the contrary, this Court declines to do so.

Two provisions of the 1942 Release are of concern here. The first provision releases claims relating to receipts from comic strips, merchandise, radio programs, movies, and any other media that Theresa Marie Nowlan or her husband "have had, now have, or may have in the future, or which my heirs, executors, or administrators hereafter can, shall or may have" against all of the parties to the lawsuit. The second release – which is contained in a separate paragraph – provides that "the party of the first part" (defined in the contract as "Theresa Marie Nowlan") assigns, releases, waives, and conveys to John F. Dille various intellectual property rights, including "all trade-marks, good will, titles including specifically 'Buck Rogers' and 'Buck Rogers In The 25th Century.'"

Defendant argues that only the first provision binds Theresa Marie Nowlan's "heirs, executors, or administrators," on the theory that failure to include the "heirs, executors, or administrators" language in the second provision means that the second provision applies only to "the party of the first part" (*i.e.*, Theresa Marie Nowlan). Drawing all reasonable inferences in the light most favorable to the Plaintiff leads to a contrary conclusion: Given that Theresa Marie Nowlan entered into the agreement in her role as the executrix of her husband's estate, one could surmise that the purpose of the contract (*i.e.* to settle the estate's intellectual property rights surrounding Buck Rogers) would be substantially undermined if the release and assignment of the trademark applied only to Theresa Marie Nowlan and John F. Dille as individuals. It is thus plausible to conclude that the release and assignment of trademark rights in the 1942 Release applies to Defendant. Accordingly, Defendant's motion to dismiss Plaintiff's contract claim shall be denied.

7

### B. Lanham Act

Plaintiff has alleged a single Lanham Act count (Count III), but that count includes two claims: (1) confusion, deception, and false description in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and (2) trademark dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

#### 1. Confusion, Deception, or False Description

Section 43(a) of the Lanham Act provides for a civil action against:

> [a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a). To state a claim under this provision, a plaintiff must show: (1) the plaintiff owns the mark; "(2) the mark is valid and legally protectable; and (3) [the defendant's] use of the mark to identify goods or services is likely to create confusion." *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 279 (3d Cir. 2001). As specified in the statute, a use must be "in commerce" to fall under the purview of this section. 15 U.S.C. § 1125(a).

Defendant argues that Plaintiff has failed to identify a "good" in relation to which any deceptive use of a mark occurred in interstate commerce. It also argues that, even if Plaintiff has identified a good and an associated use of the BUCK ROGERS mark in interstate commerce, there are no facts suggesting that a likelihood of confusion could arise from that use.

##### a. Defining the Good at Issue

8

Since "there can be no confusion as to the source of a product," – and thus no Lanham Act claim – "if there is no product," a threshold issue presented by Defendant's motion to dismiss is whether Plaintiff has identified a "good" in relation to which the BUCK ROGERS mark was deceptively used. *Silberstein v. Fox Entm't Grp., Inc.*, 424 F. Supp. 2d 616, 633 (S.D.N.Y. 2004). Defendant argues that no "good" has been identified, contending that the script cited by Plaintiff is "a mere advertisement for itself as a hypothetical commodity."

Although the Lanham Act contains an extensive list of statutory definitions, "good" is not among the defined terms. *See* 15 U.S.C. § 1127. When a statutory term is undefined, a court must "construe it in accordance with its ordinary meaning," considering "definitions of the term, the statutory context, and the case law." *United States v. Husmann*, 765 F.3d 169, 173 (3d Cir. 2014).

Using this methodology, the Supreme Court has concluded that the relevant definition of "goods" for Section 43(a) of the Lanham Act is "'[w]ares; merchandise.'" *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 31 (2003) (quoting Webster's New Int'l Dictionary 1079 (2d ed. 1949)). The Court has further held that "origin of goods" in the Act refers to origin of "the tangible product sold in the marketplace." *Id.* at 31. Construing the Act to cover only tangible goods offered for sale is reinforced by the International Schedule of Classes of Goods and Services issued pursuant to the Lanham Act, which enumerates 34 classes of goods – all tangible products that can be sold – including "Paper and cardboard; printed matter; . . . [and] instructional and teaching material." 37 C.F.R. § 6.1.

Instructive principles for applying the definition of "good" announced in *Dastar* can be found in opinions considering whether digital media content is a good under Section 43(a). Most have interpreted the emphasis on "tangible" goods not as an exclusion of digital media, but rather

9

"to distinguish goods and products offered for sale (which receive Lanham Act protection) from any 'idea, concept, or communication embodied in those goods' (which are protected only by copyright laws)." *Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 936 (E.D. Va. 2010) (quoting *Dastar*, 539 U.S. at 37, and collecting cases). For example, the Seventh Circuit recently concluded that digital song files and music videos produced for karaoke machines could, under certain circumstances, count as "goods," but whether they do so in a particular case turns on "what, if any, tangible 'good' the consumer sees, and whether the use of the plaintiffs' trademark leads to confusion about the source of that particular good." *Phoenix Entm't Partners v. Rumsey*, --- F.3d ----, 2016 WL 3924347, at *8 (7th Cir. July 21, 2016).

Trademarks themselves are not goods since it is not the marks that are offered for sale to consumers. *See Pernod Ricard LLC v. Bacardi U.S.A., Inc.*, 505 F. Supp. 2d 245, 255 (D. Del. 2007) ("The 'good' for sale in commerce by defendant is rum, not the 'Havana Club' trademark."); *see also digiGAN, Inc. v. Ivalidiate, Inc.*, No. 02-cv-420, 2004 WL 203010, at *5 (S.D.N.Y. Feb. 3, 2004) ("A patent is not a 'good or service' as those terms are used in the Lanham Act."). The exclusion of intellectual property, such as trademarks and patents, from the definition of "good" is consistent with the purpose of trademark law, which has been consistently recognized by the Supreme Court as protecting consumers from confusion about the source or endorsement of goods they purchase, and not the protection of producers' intellectual property rights. As the Court noted in *Dastar*:

> Federal trademark law 'has no necessary relation to invention or discovery,' *In re Trade-Mark Cases*, 100 U.S. 82, 94 (1879), but rather, by preventing competitors from copying 'a source-identifying mark,' 'reduce[s] the customer's costs of shopping and making purchasing decisions,' and 'helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product.' *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163-64 (1995).

*Dastar*, 539 U.S. at 34 (modifications in *Dastar*).

10

Just as a trademark itself is not a good, neither is the "'[m]ere advertising and promotion of a mark.'" *Silberstein*, 424 F. Supp. 2d at 633 (quoting *Morningside Grp. Ltd v. Morningside Capital Grp., L.L.C.*, 182 F.3d 133, 138 (2d Cir. 1999)). The court in *Silberstein* rejected a Lanham Act claim arising from the marketing of a unique logo for "commercial potential for use in an animated film or television series" because there was no actual film or series, and the logo thus served as a "mere advertisement for itself as a hypothetical commodity." *Id.*

With that background, the Court turns to this case. On one hand, Plaintiff has specifically identified "a type written script and series bible" with the title "Buck Rogers" as the "good" supporting its Lanham Act claim. The script and series bible are tangible things, and fall within the "printed matter" class of goods set forth in the federal regulations. Thus, to the extent that Plaintiff alleges that Defendant marketed the script and series bible as discrete products to Sy-Fy and other networks, these items constitute "tangible products sold in the marketplace," and therefore qualify as "goods" under the Lanham Act.

The core of Plaintiff's grievance, however, concerns alleged confusion about the BUCK ROGERS mark itself, as well as the use of the mark in relation to future entertainment products that may be derived from the script and series bible. This expansion of Plaintiff's claim stretches beyond the scope of the Lanham Act. As noted above, a trademark is not a "good" for Lanham Act purposes because the mark itself is not the product offered for sale. Similarly, future movies or television series are neither "tangible," nor "sold in the marketplace" because they do not yet exist as discrete products. Plaintiff cannot overcome the hypothetical nature of these products by basing its claim on the "rights" to produce them because, in light of *Dastar*, intangible "rights" are specifically excluded from the purview of the Lanham Act. In sum, the only "goods" identified by Plaintiff for Lanham Act purposes are the script and series bible themselves, not the

BUCK ROGERS mark itself, or any future products that might be derived from the script or series bible.

### b. Use in Interstate Commerce

Defendant next argues that Plaintiff has not alleged a use "in commerce," as required to bring conduct within the reach of the Lanham Act. This argument contains two strains: First, Defendant posits that Plaintiff has not identified a commercial (as opposed to a merely expressive) use of the mark. Second, even if there is a commercial use, Defendant argues that it occurred entirely within California and thus was not *interstate* commerce.

"Commerce" is defined by the Lanham Act to include "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. Thus, activity is "in commerce" for Lanham Act purposes if it would fall under Congress's constitutional authority to regulate interstate commerce, and Defendant's two commerce-related arguments therefore merge into a single Commerce Clause analysis.[4] It is well established that the Commerce Clause includes the "power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 17 (2005). The Supreme Court has also established that the Commerce Clause grants authority to regulate activity that is not itself "commercial" if "failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Raich*, 545 U.S. at 18.

---

[4] While Defendant has identified authority from a court in the Second Circuit suggesting that the "in commerce" provision of the Lanham Act is not coextensive with the commerce power, *see Licata & Co. v. Goldberg*, 812 F. Supp. 403, 409 (S.D.N.Y. 1993), that view is unsupported by the language of the statute and has been repudiated by subsequent precedent from the Second Circuit. *See United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*, 128 F.3d 86, 92 (2d Cir. 1997) (noting that the language of the Lanham Act "reflects Congress's intent to legislate to the limits of its authority under the Commerce Clause"). More importantly, the Third Circuit's broad interpretation of the scope of the Lanham Act weighs against a closely cabined view of its "in commerce" requirement. *See Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 165 (3d Cir. 2001) ("It has long been acknowledged that the [Lanham] Act 'confers broad jurisdictional powers upon the courts of the United States.'") (quoting *Steele v. Bulova Watch Co.*, 344 U.S. 280, 283 (1952)).

In this case, Plaintiff has alleged that Defendant attempted to sell the script and series bible to Sy-Fy – a national television network. This activity falls well within Congress's broad power to regulate interstate commerce. Plaintiff has asserted that the goods were intended to be used to develop movies or television series produced by Sy-Fy, which would be broadcast nationwide. Without the script and series bible, no movie or television series could be developed. The marketing and sale of the script and series bible are essential steps in the development of products for nationwide distribution, and thus substantially impact interstate commerce. Plaintiff has therefore alleged use of the BUCK ROGERS mark in interstate commerce.

### c. Likelihood of Confusion

Defendant argues that even if Plaintiff has identified a "good" with which the BUCK ROGERS mark was used deceptively in interstate commerce, Plaintiff has not pled sufficient facts to support its claims regarding either type of confusion covered by Section 43(a): (1) false designation of origin (*i.e.*, a use of the mark which creates confusion about the origin of the good); or (2) false endorsement (*i.e.*, a use of the mark which creates confusion about sponsorship or approval of the good). As discussed above, confusion about the BUCK ROGERS mark itself or about future goods that may be produced using that mark are not relevant, since neither the mark nor hypothetical products are "goods" for Lanham Act purposes. Thus, despite Plaintiff's attempts to broaden the analysis, Plaintiff's claims can survive only if supported by facts which plausibly suggest a likelihood of confusion regarding the script and series bible themselves.

### i. False Designation of Origin

Likelihood of confusion about the origin of a good under the Lanham Act may occur in one of two forms: either "passing off," in which "a producer misrepresents his own goods or services as someone else's," or "reverse passing off" in which a "producer misrepresents someone else's goods or services as his own." *Dastar*, 539 U.S. at 27 n.1.

The false designation of origin claim in the SAC is a reverse passing-off claim.[5] But Plaintiff does not allege that the script or series bible were produced by Plaintiff, which is the fundamental basis of a reverse passing-off claim. Plaintiff has therefore failed to plead a false designation of origin claim, and that claim shall be dismissed.

### ii. False Endorsement

To support a false endorsement claim, a plaintiff must demonstrate that "(1) its mark is legally protectable; (2) it owns the mark; and (3) the defendant's use of the mark to identify its goods or services is likely to create confusion concerning the plaintiff's sponsorship or approval of those good or services." *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1014 (3d Cir. 2008).

Although Plaintiff asserted a false endorsement claim in the SAC, the factual underpinning for this claim is unclear and neither party presented specific arguments regarding false endorsement. Looking to the factual allegations in the SAC, Plaintiff's only assertions regarding Defendant's use of the mark are that Defendant used the mark in association with the script and series bible and that Defendant claimed to own the mark. These allegations do not plausibly suggest confusion concerning Plaintiff's endorsement of the goods because it would be illogical to infer that Plaintiff sponsored or approved of the goods based on Defendant's use of a

---

[5] Although Plaintiff does not clearly articulate a theory of its false designation of origin claim, and cites to cases concerning both passing-off and reverse passing-off claims in its brief, *see* Pl.'s Br. at 20-22, the only claim in Count III of the SAC regarding "origin" alleges that Defendant's use of the mark "is likely to cause *reverse* confusion." SAC ¶ 83 (emphasis added).

mark that *Defendant* claimed to own itself.  The inference necessary to link a mark with Plaintiff's endorsement would follow only if Defendant claimed that *Plaintiff* held the mark (or remained silent and allowed confusion to persist regarding the mark's ownership).[6]  Since the facts alleged in the SAC do not plausibly suggest likelihood of confusion regarding Plaintiff's sponsorship or approval of the script and series bible, Plaintiff has failed to plead a false endorsement claim.  Defendant's motion to dismiss Plaintiff's claim under Section 43(a) of the Lanham Act shall therefore be dismissed.

### 2. Trademark Dilution

To advance a trademark dilution claim under Section 43(c) of the Lanham Act, a plaintiff must plead facts showing: (1) that the plaintiff is the owner of a mark that qualifies as a "famous" mark in light of the totality of the four factors listed in 15 U.S.C. § 1125(c)(2); (2) the defendant is making commercial use in interstate commerce of a mark or trade name; (3) the defendant's use began after the plaintiff's mark became famous; and (4) the defendant's use is likely to cause dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services.  *See* 15 U.S.C. § 1125(c)(2); *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 163 (3d Cir. 2000).[7]  Defendant argues that Plaintiff has failed to meet both the first and fourth elements of a dilution claim: fame and likelihood of dilution.

---

[6] Since the SAC does not contain the logical basis for a false endorsement claim, it is unnecessary to apply the factors set forth in *Facenda* for determining if a likelihood of confusion has been demonstrated.  *See Facenda*, 542 F.3d at 1019 (modifying the likelihood-of-confusion factors from *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983) for use in false endorsement cases).

[7] *Times Mirror* preceded the Trademark Dilution Revision Act of 2006 ("TDRA"), which expanded the Lanham Act to include claims alleging *likelihood* of dilution, rather than only claims alleging actual dilution, and amended Section 43(c) to reduce the number of statutory fame factors from eight to four.  Pub. L. No. 109-312, 120 Stat. 1730 (2006), *codified at* 15 U.S.C. § 1125(c).  The elements of a dilution claim articulated in *Times Mirror* have thus been modified above to integrate changes effected by the TDRA.

Turning first to fame, a mark is only famous for trademark dilution purposes if it is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A)(i)-(iv). This determination requires consideration of "all relevant factors," including: (1) the scope of advertising of the mark; (2) the amount of sales offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark was registered. 15 U.S.C. § 1125(c)(2)(A)(i)-(iv).

Defendant argues that Plaintiff has failed to adequately plead fame for two reasons. First, it notes that Plaintiff no longer holds a registration for the mark and that its prior registrations were allegedly cancelled for abandonment and, second, it argues that Plaintiff has not set forth any facts with respect to the scope of advertising of the mark, the amount of sales offered under the mark, or the extent of actual recognition of the mark. It is undisputed that Plaintiff does not hold an active registration for the BUCK ROGERS mark. Whether the prior registrations were cancelled for abandonment (as Defendant argues) or were voluntarily surrendered (as Plaintiff argues) cannot be determined at this stage. However, the fact that Plaintiff does not currently hold a registration for the mark does not foreclose a finding of fame since the statute establishes a totality-of-the-circumstances test for fame. *See Valley Forge Military Acad. Found. v. Valley Forge Old Guard, Inc.*, 24 F. Supp. 3d 451, 458 (E.D. Pa. 2014) (allowing a Lanham Act dilution claim to proceed despite lack of registration).

With respect to the other fame factors, Plaintiff has pled that products bearing the Buck Rogers mark – artwork, replicas, books, comic books, graphic novels, toys, shirts, belt buckles and card cases, DVD sets, statues, die cast space ship models, t-shirts, mini-toys, action figures, ray guns, artwork, posters, feature films, computer software, radio programs – are sold and

distributed all over the United States, that Plaintiff has produced movies and television products with Universal Studios and Walt Disney using the "Buck Rogers" name, and that several Buck Rogers-related items are displayed at the Smithsonian.  Since it could be plausibly inferred that a mark used in nationwide marketing on a wide range of products and displayed as part of an exhibit at a major national museum enjoys wide public recognition in distinguishing merchandise and products, Plaintiff has provided enough factual support for the fame element at the motion to dismiss stage.

The Court turns next to Defendant's argument that Plaintiff has failed to plead likelihood of dilution.  Although the SAC asserts a claim for "dilution by blurring or dilution by tarnishment," the factual support in the SAC and the legal argument in Plaintiff's brief concern only dilution by blurring, which occurs from an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B).[8]  Defendant argues that Plaintiff has failed to plead facts to show that dilution occurred.  But Plaintiff need not show actual dilution:  In light of the revisions enacted by the TDRA, demonstrating a *likelihood* of dilution is sufficient to state a claim.  *See* 15 U.S.C. § 1125(c).  The Lanham Act contains six suggested factors for evaluating likelihood of dilution:

> (i) The degree of similarity between the mark or trade name and the famous mark.
>
> (ii) The degree of inherent or acquired distinctiveness of the famous mark.
>
> (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.
>
> (iv) The degree of recognition of the famous mark.

---

[8] Dilution by tarnishment is "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark."  15 U.S.C.(c)(2)(C).  As there are no allegations that Defendant's alleged use of the mark harmed the reputation of the mark itself, the SAC does not support a dilution by tarnishment claim.

17

(v) Whether the user of the mark or trade name intended to create an association with the famous mark.

(vi) Any actual association between the mark or trade name and the famous mark.

15 U.S.C. § 1125(c)(B)(i)-(vi).

Plaintiff has asserted facts that directly address these factors. The core of its claim is that Defendant used the same mark in the same marketplace as Plaintiff (*i.e.*, licensing of the rights for movies, television series, and associated merchandise). Plaintiff has also pled numerous facts concerning its own established use of the mark in that marketplace, as well as facts suggesting that this use was widely recognized. Taken as true, these allegations are sufficient to plausibly support an inference that Defendant's use created a likelihood of dilution by blurring, and Defendant's motion to dismiss Plaintiff's claim for trademark dilution under Section 43(c) of the Lanham Act shall be denied.

### C. State Law Claims

#### 1. Trademark Infringement

Courts have consistently held that trademark infringement claims under Pennsylvania state law, 54 Pa. Cons. Stat. § 1123, are analyzed under the same standards as claims under Section 43(a) of the Lanham Act due to the nearly identical language in the federal and Pennsylvania statutes. *See Scott Fetzer Co. v. Gehring*, 288 F. Supp. 2d. 696, 701 n.7 (E.D. Pa. 2003) ("The federal statute and the state laws are identical except that the Pennsylvania law narrows the focus to acts within the Commonwealth."). Thus, for the same reasons that Plaintiff's claim under Section 43(a) of the Lanham Act cannot survive, Defendant's motion to dismiss shall be granted with respect to Plaintiff's state-law claim for trademark infringement.

### 2. Unfair Competition/Trademark Dilution

Prior to 2006, Pennsylvania's trademark dilution statute mirrored the language of Section 43(c) of the Lanham Act, and was therefore analyzed under the same standards. *See id.* at 701 n.7. However, after the Supreme Court ruled that Section 43(c) required evidence of actual dilution, *see Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 433 (2003), Congress changed the language of Section 43(c) to cover uses of a mark that are "likely to cause dilution." 15 U.S.C. § 1125(c)(1). The Pennsylvania statute was not correspondingly revised and continues to provide for relief only when a use "causes dilution" to the plaintiff's ability to use the mark. *See* 54 Pa. Cons. Stat. § 1124. There is thus now a divergence between the Lanham Act and Pennsylvania trademark law on the standard for a dilution claim. *See McNeil Nutritionals, LLC v. Heartland Sweeteners LLC*, 512 F. Supp. 2d 217, 237 (E.D. Pa. 2007), *aff'd in part, rev'd on other grounds*, 511 F.3d 350 (3d Cir. 2007) (holding that the Pennsylvania trademark dilution statute continued to require a showing of actual dilution after the Lanham Act was revised to include likelihood of dilution); *see also Moseley*, 537 U.S. at 433 (analyzing the pre-1996 Lanham Act and concluding that it "unambiguously requires a showing of actual dilution, rather than a likelihood of dilution").

Plaintiff has alleged that Defendant engaged in conduct that is "likely to cause dilution," but has not alleged that any dilution actually occurred, nor does the SAC contain facts to support an inference that dilution occurred beyond the conclusory assertion that Plaintiff's reputation has been injured. In light of the statutory language requiring actual dilution under Pennsylvania law, and the precedent requiring a showing of actual dilution under the analogous pre-2006 language in the Lanham Act, Plaintiff's failure to plead facts showing actual dilution is fatal to its state-law trademark dilution claim, and Defendant's motion to dismiss that claim shall be granted.

An order follows.

**Dated**:  September 16, 2016

        **BY THE COURT:**

        **/S/WENDY BEETLESTONE, J.**

        _____

        **WENDY BEETLESTONE, J.**