# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE DILLE FAMILY TRUST,<br>**Plaintiff,** | CIVIL ACTION |
| **v.** | |
| THE NOWLAN FAMILY TRUST,<br>**Defendant.** | NO. 15-6231 |

## MEMORANDUM

Remaining in this chapter of the long-running contest between Plaintiff, the Dille Family Trust, and Defendant, the Nowlan Family Trust, over the intellectual property rights to Buck Rogers are Plaintiff's: 1) challenge to the decision of the U.S. Trademark Trial and Appeal Board ("TTAB") rejecting Plaintiff's opposition pursuant to Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d), and Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), to the Defendant's intent-to-use application to register the BUCK ROGERS mark; 2) contract claim arising out of a purported Release and Assignment dating to 1942; and, 3) trademark dilution claim under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). Before the Court are Defendant's four motions to exclude the testimony of Plaintiff's proposed expert witnesses, Defendant's motion for summary judgment, and Plaintiff's partial motion for summary judgment.[1]

## I.   BACKGROUND

Although this dispute dates back more than three quarters of a century, the present case is quite narrow in scope. Plaintiff opposes Defendant's application to register the BUCK ROGERS mark, asserting that it has senior rights. Plaintiff also alleges that in 2015, Defendant engaged in negotiations with NBC Universal and attempted to sell a BUCK ROGERS script. Defendant

---

[1] A general overview of the factual and procedural history of the parties' underlying dispute may be found in the Court's opinion accompanying the order granting in part and denying in part Defendant's motion to dismiss the Second Amended Complaint. *Dille Family Tr. v. Nowlan Family Tr.*, 207 F. Supp. 3d 535, 538-40 (E.D. Pa. 2016).

asserts that these actions created a likelihood of dilution of its mark, and also breached a 1942 agreement between John F. Dille, whose newspaper syndicated the original comic strip, and the estate of Philip F. Nowlan, the author of the novelettes that inspired the comic strip, and who for some time provided narrative content for the comic strip.

## A. The Parties

John F. Dille and Philip F. Nowlan – both long deceased – are not parties to this case, and neither are their estates. Instead, this case involves a dispute by family trusts established by their respective descendants.

The Dille Family Trust was created on August 16, 1979 by Robert C. Dille – the son of John F. Dille – and his wife, Virginia N. Dille, who were its first trustees. JA 1034. Before 1979, the record contains what appear to be a series of federal trademark registrations, renewals, assignments and licenses between John F. Dille, Robert C. Dille, and various corporations that they controlled, as well as licensing agreements with entities that produced Buck Rogers merchandise and creative works. It is undisputed that from the late 1920's to the early 1980's, Buck Rogers appeared in comic strips, radio, film, and television – including the 1979-1981 film and television series by Universal Pictures. Plaintiff contends that by virtue of these assignments, it succeeds to the rights of John F. Dille in the BUCK ROGERS mark.

Virginia N. Dille continued to serve as Plaintiff's trustee until her passing in 2009. After a series of interim trustees, Louise M. Geer was made successor trustee in 2011 by Nicholas Flint Dille and Lorraine Virginia Dille Williams, who are the children of Robert C. and Virginia N. Dille, and who are beneficiaries of the Dille Family Trust. For completeness's sake, it should be noted that Geer is the wife of Plaintiff's trial counsel, Daniel Herman. Geer, who is an attorney, and Herman are partners in the law firm of Geer and Herman, P.C. Geer and Herman also own

and control Herman & Geer Communications, which does business as "Hermes Press." Plaintiff contends that Hermes Press was, for a period of time, licensed to use the BUCK ROGERS mark on books of reprints of the original Buck Rogers comic strips.

For its part, the Nowlan Family Trust dates to August 1, 2004, when it was created by its trustee Brian McDevitt, a grandchild of Philip F. Nowlan and Theresa M. Nowlan. JA 3075-95. The Nowlan Family Trust is a business trust organized under Pennsylvania law and registered with the Commonwealth. JA 3075-96. Brian McDevitt's sister, Diane H. McDevitt is an agent for the Nowlan Family Trust. JA 2977. The Nowlan Family Trust Agreement identifies as permissible beneficiaries the descendants of Philip Francis Nowlan, as determined when the net assets of the trust exceed $1 million. JA 3075.

## B. TTAB Proceedings

Plaintiff proceeds in Count One of the Second Amended Complaint pursuant to 15 U.S.C. § 1071(b), challenging the TTAB's rejection of its opposition to the Defendant's intent-to-use application to register the BUCK ROGERS mark for use on a wide range of goods and services, including films, television shows, and related merchandise. The central issue is whether Plaintiff can establish prior trademark rights in BUCK ROGERS – the TTAB concluded on the record before it that Plaintiff could not, but Plaintiff is entitled to a *de novo* review of that conclusion before this Court under 15 U.S.C. § 1071(b). If Plaintiff can establish such rights, and provided that Defendant cannot establish that Plaintiff abandoned the mark, 15 U.S.C. § 1127 ("Abandonment (1)"), the question would then arise as to whether Defendant's intended use of the mark would be likely to cause confusion with, or dilution of, Plaintiff's mark, either of which would be grounds to reject Defendant's trademark application. 15 U.S.C. § 1052(d) (asserting seniority is permissible basis on which to oppose a registration); 15 U.S.C. § 1063(a) (identifying

"dilution by blurring . . . under section 1125(c) as a permissible grounds for opposition to a registration); 15 U.S.C. § 1125(c)(2)(B) (defining dilution by blurring).

These questions arise out of a knotty procedural history that dates to the beginning of 2009. At that time, Plaintiff, held two federal registrations for the BUCK ROGERS mark: Registration Number 714,184 for newspaper comic strips, and Registration Number 1,555,871 for board games. JA 4-7. On January 15, 2009, Defendant filed its intent-to-use trademark application. JA 5061-65. Following an examination of Defendant's trademark application, the U.S. Patent and Trademark Office ("USPTO") refused publication pursuant to 15 U.S.C. § 1062(b), concluding that Defendant was not entitled to registration due to a likelihood of confusion with Plaintiff's mark. AJA 11434 (citing Registration Number 714,184 and Registration Number 1,555,871). On October 2, 2009, Defendant filed a petition to cancel Defendant's registrations (Numbers 714,184 and 1,555,871), asserting fraud in their maintenance and abandonment. JA 462-69. In January of 2011, Plaintiff filed a "notice of voluntary surrender" in the proceedings to cancel Registration Numbers 714,184 and 1,555,871. JA 2-3. In light of that filing, on February 1, 2011, the TTAB granted Defendant's cancellation petition, and on April 5, 2011, the USPTO cancelled Registration Numbers 714,184 and 1,555,871. JA 9-10.

Once the cancellation proceedings were resolved, Defendant's trademark application was published in the Official Gazette on June 14, 2011. JA 12. On July 12, 2011, Plaintiff filed its opposition to Defendant's trademark application. JA 12-22. Plaintiff's asserted basis was that it had used and / or licensed the BUCK ROGERS mark for use on various products and services on an ongoing basis since 1928, including "comic books, action figures, feature films, picture frames, belt buckles, key chains, resin statues, artwork, t-shirts, board games, computer software,

internet television show license, DVDs, Blu-Ray video discs, and radio programs," thereby rendering Defendant's registration of BUCK ROGERS likely to cause confusion with, or dilution of, the Plaintiff's mark. JA 20-21.

Following several years of litigation, on September 25, 2015, the TTAB dismissed Plaintiff's opposition to Defendant's trademark application. JA 1251-65. Noting that at the time Plaintiff filed its opposition, it did not hold any valid federal registrations, the question was whether Plaintiff could show that it had established trademark rights before January 15, 2009 – the date from which Defendant may be able to claim constructive use of the mark, for the purpose of establishing priority, by virtue of its intent-to-use trademark application. JA 1255. The TTAB dismissed the Plaintiff's opposition primarily due to a lack of evidence connecting the trademark's pre-1942 chain of title to the Dille Family Trust, and a lack of evidence of prior use sufficient to establish trademark rights in the Dille Family Trust. JA 1255-65. Although the TTAB considered Plaintiff's contention that Hermes Press, as a licensee, had sold books of reprinted comic strips from approximately 2008 through 2014, the TTAB did not find sufficient evidence to credit Plaintiff's contention that the books were sold before January 15, 2009, and thus concluded that the use of the mark by Hermes Press was insufficient to establish trademark rights in Plaintiff.

### C. 2010 Negotiations with Cartoon Network

Meanwhile, in early 2010 the Nowlan Family Trust, Flame Ventures, LLC, (whose principal is Tony Krantz), the Cartoon Network, and later, the Dille Family Trust, engaged in negotiations regarding the licensing of the rights for a Buck Rogers film and television series. JA 5066. Ultimately, these discussions yielded a draft letter agreement dated March 7, 2010, which contemplated the Dille Family Trust and the Nowlan Family Trust granting a license in

whatever rights to Buck Rogers they held to Cartoon Network for a Buck Rogers film and / or television series to be produced in conjunction with Flame Ventures.  JA 1316-19.  The agreement was executed in part by the Nowlan Family Trust, but Brian McDevitt suggested in his affidavit that the Nowlan Family Trust rescinded its acceptance before any other parties executed the agreement.  JA 1316; 5066-67.  It is, however, undisputed that the Dille Family Trust was aware of the draft agreement, and as relevant here, learned during negotiations that the Nowlan Family Trust had represented to Cartoon Network that it held rights in the Buck Rogers character.  *See* Def.'s Stmt. Undisputed Facts, ¶ 64; Pl.'s Resp. to Def.'s Stmt. Undisputed Facts, ¶ 64.

### D.  2015 Negotiations with NBC Universal / Syfy

Despite the collapse of negotiations with Cartoon Network, the parties continued to seek various licensing deals to bring Buck Rogers back to the screen, which brings us to the events of 2015 that are the basis for the contract and dilution claims.

In November of 2013, the Dille Family Trust's licensing agent, Licensing Works, approached Rafael Gomez-Cabrera, a business affairs executive at NBC Universal (which owned the Syfy channel during the time period at issue) with a proposal to license Plaintiff's rights in Buck Rogers for use in a film and / or television series.  JA 1963-69.  Negotiations lasted for more than a year.  Although NBC Universal and the Dille Family Trust exchanged several rounds of offers and counter-offers, they were not able to reach an agreement and negotiations fell through by April of 2015.  JA 1970-2031.

While Gomez-Cabrera was negotiating with the Dille Family Trust, he learned of its ongoing dispute with the Nowlan Family Trust regarding Buck Rogers.  JA 1997, 2649-50 (indicating Gomez-Cabrera was aware of the ongoing trademark litigation as early as May of

2014). In the hopes of securing an agreement with all parties who claimed rights in Buck

Rogers, in February of 2015, without informing the Dille Family Trust, Gomez-Cabrera

contacted counsel for the Nowlan Family Trust. JA 2649-50, 3746. Following initial

discussions, in March of 2015, NBC Universal made an offer to the Nowlan Family Trust for a

license to use Buck Rogers in a television series. JA 2651, 3757. In April, Diane McDevitt, in

her capacity as an agent of the Nowlan Family Trust, met with Rafael Gomez-Cabrera, as well as

Paul Shapiro and Eli Kirschner (creative executives with the Syfy channel) in Los Angeles. JA

2652, 3792. On June 29, 2015, Gomez-Cabrera emailed Defendant a revised offer. JA 3813.

Discussions between NBC Universal and the Nowlan Family Trust continued into the fall

of 2015. JA 3821-22. On September 21, 2015, the Nowlan Family Trust's representative, Joel

Gotler, emailed Gomez-Cabrera a list of terms that the Nowlan Family Trust wished to

incorporate. On October 20, 2015, NBC Universal sent the Nowlan Family Trust a third offer.

JA 3826. On October 27, 2015, Tony Krantz emailed Gomez-Cabrera the TTAB decision

rejecting Plaintiff's opposition to Defendant's trademark application. JA 3839. Soon after,

Gomez-Cabrera and others on NBC Universal's Syfy team scheduled a meeting with the Nowlan

Family Trust for November 3, 2015. Before the meeting, Flame Ventures sent NBC Universal

Krantz's script for BUCK ROGERS. JA 3855. The cover page for the script reads "BUCK

ROGERS,$^{TM}$ Written by Tony Krantz, Adapted from ARMAGEDDON 2419 A.D. by Philip

Francis Nowlan; Flame Ventures in association with Diane McDevitt and Brian McDevitt.

BUCK ROGERS is a trademark of the Nowlan Family Trust." JA 3856. Gomez-Cabrera

testified that Tony Krantz pitched the Buck Rogers script at the meeting. When Gomez-Cabrera

asked whether Defendant "had the rights," he was told by Defendant's attorney that it did, but

that Defendant was not prepared to indemnify NBC Universal. JA 2654.

No deal came to pass, and on November 19, 2015, Plaintiff filed the instant lawsuit.

**E.  Origin and 1942 Release and Assignment**

As for the contract claim, it is necessary to briefly touch on the origins of Buck Rogers – a 25th century character – in the first half of the 20th century.  In August of 1928, Philip Francis Nowlan's story *Armageddon 2419 A.D.* appeared in the magazine *Amazing Stories* and featured the character "Anthony Rogers" as its protagonist.  In 1929, the sequel – *The Airlords of Han*, also featuring Anthony Rogers – appeared in the same magazine.  Around the same time, there is evidence to suggest that Philip F. Nowlan and John F. Dille's National Newspaper Service entered a contract for the syndication of a comic strip titled "Buck Rogers" (the "Syndication Agreement").  JA 3250-52.  The contract identified Philip F. Nowlan as the "creator of certain material suitable for newspaper publication . . . entitled 'Buck' Rogers."  JA 3250.  Nowlan was to provide the National Newspaper Service with material for syndication of "[a] story in strip form of conditions in America [s]ome five hundred years hence," to run daily for six weeks.  *Id.*

Although incomplete, and at times somewhat impenetrable, the record suggests that the business relationship between John F. Dille and Philip F. Nowlan continued throughout the 1930's, with ongoing syndication of the Buck Rogers comic strip illustrated by Richard Calkins.  After Philip F. Nowlan died in 1940, his widow, Theresa M. Nowlan, as executrix of his estate, brought a case in the United States District Court for the Northern District of Illinois against John. F. Dille, National Newspaper Service, John F. Dille Co., Calkins, and Buck Rogers Company.  JA 3253-82.  The complaint alleged that the defendants had underpaid Philip F. Nowlan under the Syndication Agreement and other contracts.  As a remedy, the estate sought an accounting or specific performance.  *Id.*

The present breach of contract claim is based on a document dated May 14, 1942, titled "Full and Complete Release and Assignment" (the "1942 Release and Assignment"). JA 49-56. That document is signed "Theresa Marie Nowlan," and is accompanied by a notary's affidavit – which attests to the signature of "Theresa Maria [sic] Nowlan" in Philadelphia – as well as a stipulation of dismissal of the Illinois lawsuit. JA 51-54. Following three paragraphs of recitals, in which the parties indicate their intention to settle the Illinois suit, the document provided that in exchange for $1,750, Theresa Marie Nowlan released all claims that "Philip Francis Nowlan or I have had, now have, or may have in the future, or which my heirs, executors, or administrators hereafter can, shall or may have," against any of the parties to the suit, including the rights to receipts from "newspaper strips, merchandise, radio, movies, and all other subject matter. All contracts of every kind or nature which exist or may exist and all right thereunder are hereby terminated and forever released." JA 50-51. In a separate paragraph, the document also provided that:

> The party of the first part [Theresa Marie Nowlan] hereby assigns, releases, waives and conveys all claims, rights and interests of any kind whatsoever in and to all copyrights to John F. Dille Co., and in and to all trade-marks, good will, titles including specifically "Buck Rogers" and "Buck Rogers In The 25th Century" and all characters, patents and inventions and all other subject matter relating in any way to the Buck Rogers features to John F. Dille.

JA 51.[2]

Although neither party in this matter is a named party to the 1942 Release and Agreement – and indeed, could not have been because the document predates both by decades – Plaintiff

---

[2] The record includes copies of two checks dated May 22, 1942, consecutively numbered (5802 and 5803), made out by the National Newspaper Service and signed by John F. Dille. JA 55-56. The first is in the amount of $1,750, and is made out to and endorsed by "Theresa Marie Nowlan, widow of Philip Francis Nowlan." JA 55. The second is in the amount of $7,000, and is made out to and endorsed by "Theresa Marie Nowlan, as executrix of the estate of Philip Francis Nowlan." JA 56. Although the $7,000 is not reflected in the 1942 Release and Assignment, it is referenced in the May 8, 1942 Order of the Orphans' Court of Montgomery County, Pennsylvania, authorizing Theresa M. Nowlan, as executrix of the estate of Philip F. Nowlan, to settle the Illinois lawsuit for that amount. JA 3284.

asserts that it is the successor in interest to the John F. Dille Co., and that Defendant is the successor in interest to Theresa Marie Nowlan. From that premise, Plaintiff contends that the representations Defendant made during the 2015 negotiations with NBC Universal breached the 1942 Release and Agreement.

## II.    RULE 702 MOTIONS

Turning first to Defendant's motions to exclude Plaintiff's proposed expert opinion testimony. Rule 702 of the Federal Rules of Evidence "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (discussing standard for expert opinion testimony deriving from *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)). Although originally propounded in the context of scientific experts, *Daubert*'s "general principles" also extend to non-scientific expert opinion testimony covered by Rule 702. *United States v. Mitchell*, 365 F.3d 215, 234 (3d Cir. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)).

The development of these restrictions has led to a flexible and practical approach to expert testimony. First as to an expert's qualification, "Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998). This requirement has been subject to a "liberal" interpretation by the Third Circuit, which has "held that a broad range of knowledge, skills, and training qualify an expert as such." *In re Paoli R.R. Yard PCB Litig.* ("*Paoli II*"), 35 F.3d 717, 741 (3d Cir. 1994) (citation omitted). Nevertheless, "at a minimum, a proferred expert witness . . . must possess skill or knowledge greater than the average layman." *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987). Second, reliability turns on whether "the particular opinion is based on valid reasoning and reliable methodology." *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999)

(internal quotation marks and citation omitted).  Accordingly, expert testimony must be based on rigorous "'methods and procedures'" rather than "'subjective belief or unsupported speculation.'" *Paoli II*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 590).  More succinctly, it must be "supported by good grounds."  *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 81 (3d Cir. 2017) (internal quotation marks and citation omitted).  The Third Circuit has consistently cautioned that the reliability standard is "'not that high'" and is "'lower than the merits standard of correctness.'"  *Id.* at 81 (internal quotation marks and citation omitted).  Third, fit refers to the requirement that "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact."  *Schneider*, 320 F.3d at 404.

As will be seen, the Court will deny Defendant's motion for summary judgment on the registration claim (Count One), *infra* Part III.A, but will grant Defendant's motion for summary judgment on the trademark dilution (Count Three) and contract (Count Two) claims, *infra* Parts III.B and III.C.  Because the same disposition of the summary judgment motions would obtain even if the Court were to consider the opinions of Richard A. Spreng, Ph.D, and Michael S. Ramage, and because their opinions are not relevant to the registration claim that will proceed to trial, Defendant's motions to exclude their testimony shall be dismissed as moot.  Accordingly, the Court limits its discussion here to the Defendant's motions to exclude the testimony of Jeff Rovin and Michael Lazzara.

### A.  Jeff Rovin

Plaintiff offers Jeff Rovin as an expert in "the history of 'BUCK ROGERS' and the continuous use of 'BUCK ROGERS' in comic strips, books, products and memorabilia."  More specifically, he would opine that: (1) the success of Buck Rogers as a cultural phenomenon owes more to John F. Dille's syndication than Philip F. Nowlan's "original inventiveness," ECF 91 at

4-10, 17; (2) that "the Dille Family Trust trademarks of Buck Rogers, Buck Rogers in the 25th Century, and many of the characters and props that are part of his fictional universe, have been in continuous use since 1928," *id.* at 4; and, (3) that "Buck Rogers has been licensed as such – that is, as 'Buck Rogers' not as 'Anthony Rogers' – in a continuous run since 1928 and with an unbroken chain of ownership currently vested in the Dille Family Trust." *Id.* at 10. Although Plaintiff does not indicate which claims Rovin's testimony would support, it appears from this summary that they may bear on Plaintiff's challenge to the TTAB decision rejecting its opposition pursuant to 15 U.S.C. § 1052(d) to Defendant's trademark application, and Plaintiff's dilution claims pursuant to 15 U.S.C. § 1125(c), but not Plaintiff's contract claim.

Rovin's first opinion may be characterized as historical – that John F. Dille, the newspaper man, contributed more than Philip F. Nowlan, the content generator, to the success of Buck Rogers. There is little question that Rovin is qualified to testify as an expert in the history of Buck Rogers. Although he has no formal academic training, his professional experiences suffice to provide the requisite specialized knowledge in the field of science fiction history.[3] It also appears that his methods are sufficiently reliable, as he consulted books, comic strips, and vintage memorabilia, JA 817, which are precisely the methods a historian might be expected to employ to arrive at such an opinion.

Nevertheless, Rovin's first opinion is inadmissible under Rule 702 because the issue of John F. Dille's and Philip F. Nowlan's relative contribution to the success of Buck Rogers does

---

[3] Rovin currently works as a "novelist and genre historian . . . [of] science fiction, fantasy, [and] horror." JA 813. He began his career "as a staff proofreader, assistant editor, editor, marketing director, and writer for several New York-based publishing companies, all of them heavily invested in science fiction and fantasy publications and licensing." JA 1895. Rovin has written "many . . . nonfiction books . . . about science fiction and science fiction - based toys and games," and has published "numerous articles about Buck Rogers and his world." *Id.* He also worked as a consultant for a science fiction mail order firm from 1976 to 1983, in which capacity he wrote advertisements for and "purchased many Buck Rogers products." *Id.* Around this time, Rovin wrote a book called the Science Fiction Collector's Catalog, which included descriptions of Buck Rogers merchandise. JA 814-15. He has also "attended countless Comic Cons, toy fairs, comic book stores . . . [and] vintage toy [shops]." *Id.*

not fit with the narrow factual disputes in this case. Indeed, Plaintiff advances no argument as to how this aspect of Rovin's testimony is relevant to any legal issue in this case, ECF 114 at 3-4, and none is apparent from the record. The trademark claims that remain are about whether the Dille Family Trust can demonstrate that it established trademark rights in BUCK ROGERS that predate January 15, 2009. Although the question of whether the commercial success of Buck Rogers owes more to John F. Dille or Philip F. Nowlan is surely of great interest to the parties, and to Buck Rogers fans, it is simply irrelevant to the trademark questions that the trier of fact must answer here.

Rovin's second and third opinions are directed at the trademark claims in this case. By virtue of Rovin's opinion that Plaintiff and its predecessors in interest have continuously used and licensed Buck Rogers (and not "Anthony Rogers") since 1928, Plaintiff seeks to prove that it has established trademark rights in BUCK ROGERS that have not been abandoned. As such, unlike Rovin's first opinion, these opinions are relevant to disputed issues. However, they would not be helpful to the trier of fact because Rovin has no specialized knowledge in trademarks or licensing, and so is unqualified to offer them.

As previously noted, Rovin lacks any formal education after high school, and so he has had no formal legal training in trademarks or licensing. JA 816. His practical experience with trademarks or licensing is equally limited. When asked, "[w]hat is your experience with trademarks?", he answered, "[a]s a publisher, I have a partner who handles all of that, so it's kind of a carom shot with me. I don't get involved with that." *Id.* Rovin further admitted that he does not know the legal definition of "use in commerce," *id.*, and was unable to explain "the difference between use of the character named Buck Rogers and the use of the trademark Buck Rogers," *id.* (A: "I couldn't tell you."). Nor does he know "what the . . . legal requirements for a

valid trademark license are." JA 819. Moreover, none of his published books or articles have anything to do with trademarks or licensing. JA 816. Accordingly, Rovin is unqualified to offer his second and third opinions, and Defendant's motion to exclude his opinion testimony will be granted in its entirety.[4]

### B. Michael D. Lazzara, Esq.

Plaintiff also offers the testimony of Michael D. Lazzara, a partner in the Pietragallo Law Firm in Pittsburgh, with extensive experience in intellectual property law. Lazzara conducted what he characterized as a "chain of title for ownership of rights in the 'Buck Rogers' trademark in the United States." ECF 93 at 4-5. To perform this assessment, Lazzara reviewed the record in the present matter, conducted a search of trademark filings and documents at the U.S. Patent and Trademark Office, consulted state of Illinois corporate documents and records, reviewed a "character report" for the Buck Rogers character, personally interviewed Louise Geer, the trustee of the Dille Family Trust, and conducted internet searches. *Id.* at 5. He compiled this information into a list that he "viewed as important events involving and surrounding the 'Buck Rogers' mark." *Id.* at 6. The list includes 53 events, stretching from August 27, 1926 to February 8, 2013, and consists of numbered entries that summarily identify purported contracts, assignments, licenses, trademark registrations and renewals. *Id.* at 7-16. On the basis of this list, he would offer two opinions: (1) "[t]he Dille Family Trust currently owns rights in the 'Buck Rogers trademark, with particular regard to comic strips, books, games, toys, television shows, and motion pictures in view of various ownership change and licensing activities which have occurred involving the 'Buck Rogers' trademark"; and, (2) "no significant period of non-use of

---

[4] Defendant does not challenge, nor does the Court address here, whether Rovin may testify as a percipient fact witness with personal knowledge of the Plaintiff's use of the BUCK ROGERS mark in commerce, or that of Plaintiff's licensees, or others whose use might be shown by other competent evidence to inure to Plaintiff's benefit for trademark purposes.

the 'Buck Rogers' [sic] occurred during the history of its usage that would reasonably lead to a conclusion that the mark had been abandoned in view of such non-use." *Id.* at 6.

Defendant's principal objections to these opinions are that they are not reliable and do not fit with the case. Both objections have merit. First, with respect to reliability, the Lazzara report contains little more than the list of events and a conclusory assertion as to the existence of Plaintiff's trademark rights. As Defendant points out, the report does not include any explanation as to Lazzara's criteria for including or excluding an event from his list. The failure to offer such explanation is striking in light of Lazzara's puzzling decision to omit any mention of the April 5, 2011 cancellation by the U.S. Patent and Trademark Office of Plaintiff's registrations of BUCK ROGERS for use on newspaper comic strips (Registration No. 714,184) and board games (Registration No. 1,555,871).[5] JA 9-10. Nor does the Lazzara report provide any explanation as to the significance of the events its author did see fit to include. Without such explanation it is impossible to determine whether Lazzara's conclusions logically flow from the evidence that he reviewed.

Second, even if Lazzara had explained his selection criteria and the significance of the events he identified as important, his opinions do not meet the fit requirement for expert opinions because they would not be helpful to the trier of fact. In essence, Plaintiff seeks to have Lazzara opine as to the legal consequences of the evidence he has reviewed, which consists primarily of legal documents. The problem is that "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006) (footnote and citations omitted). Such testimony is unnecessary for the Court to determine the applicable law. And "[e]ven during a bench trial

---

[5] Although these registrations were cancelled after January 15, 2009, they appear on the record before the Court to have been Plaintiff's only federal registrations in effect during a critical time period in question, and so their cancellation would seem to be relevant to the trademark issues in this case.

there seems no compelling reason to allow live testimony by conflicting experts on the law, as written briefs, supplemented by oral argument by counsel if appropriate, will serve the same function." David H. Kaye, The New Wigmore: A Treatise on Evidence, Expert Evidence, at § 2.3 (2d ed. 2011). Lazzara's testimony risks wasting a substantial amount of time, as his opinion would presumably duplicate whatever arguments Plaintiff's counsel would make as to the legal implications of the facts in evidence vis-à-vis Plaintiff's trademark rights in BUCK ROGERS. Such redundancy is both unnecessary and unhelpful to the trier of fact, and so Defendant's motion to exclude Lazzara's opinion testimony will be granted.

## III.    SUMMARY JUDGMENT MOTIONS

The Court turns next to the motions for summary judgment. "[S]ummary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (quoting Fed. R. Civ. P. 56(c)). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (first citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); then citing *Anderson*, 477 U.S. at 248-52). Material facts are those which "might affect the outcome of the suit under the governing substantive law." *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). On a motion for summary judgment, "[t]he reviewing court should view the facts in the

light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). The procedure "is no different where there are cross-motions for summary judgment." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008) (citing *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)).

To prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (quoting *Anderson*, 477 U.S. at 252) (alteration in *Jakimas*). As the Third Circuit has observed, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Abington Friends Sch.*, 480 F.3d at 256 (citing *Celotex*, 477 U.S. at 322-26). To make a showing of a genuine dispute, "the non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment." *Ramara, Inc. v. Westfield Ins. Co.*, 814 F. 3d 660, 666 (3d Cir. 2016).

### A. Plaintiff's Opposition to Defendant's Trademark Application – Count One

The parties have filed cross motions for summary judgment on Count One of the Second Amended Complaint, in which Plaintiff challenges the TTAB's rejection of its opposition to the Defendant's intent-to-use application for the BUCK ROGERS mark.[6] Each is addressed in turn.

### 1. Defendant's Motion – Priority and Abandonment

In its motion for summary judgment, Defendant contends that Plaintiff's opposition to Defendant's intent-to-use application to register the BUCK ROGERS mark must fail because

---

[6] To the extent Plaintiff's opposition to Defendant's application to register the mark is premised on trademark dilution under Section 43(c) of the Lanham Act, that issue is addressed *infra*, Part III.B.

Plaintiff cannot establish prior use of the mark, and that even if it could, Plaintiff abandoned the mark. However, a review of the record indicates there are genuine factual disputes as to both of these issues that preclude summary judgment on Count One.

Section 2(d) of the Lanham Act provides a basis for rejecting an application to register a mark where the application "[c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d). Here, the key date is January 15, 2009 – the date on which Defendant filed its intent-to-use application, and from which Defendant, contingent on perfection of its intent-to-use application, may claim constructive use of the BUCK ROGERS as its first use, thereby conferring "priority over anyone using the mark after that date unless the person earlier used the mark." *Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.*, 186 F.3d 311, 315 (3d Cir. 1999) (first citing 15 U.S.C. §§ 1051(b); then citing 15 U.S.C. § 1057(c)).

Because Plaintiff has no valid federal registration for BUCK ROGERS, it must establish[7] "prior use of the mark 'in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" *Lucent Info. Mgmt.*, 186 F.3d at 315 (quoting *Blue Bell, Inc. v. Farah Mfg. Co., Inc.*, 508 F.2d 1260, 1266 (5th Cir.1975)); *see also Covertech Fabricating, Inc. v. TVM Bldg. Prod., Inc.*, 855 F.3d 163, 170 (3d Cir. 2017) ("The first use test is generally proper for unregistered trademarks, taking account of the well-established common law principle of 'first-in-time, first-in-right' that rewards actual and continuous use in commerce as between market competitors." (citing *Ford*

---

[7] As the party opposing registration of the mark, it is Plaintiff's burden to establish that the applicant – here, Defendant – does not have the right to register its mark. *Hoover Co. v. Royal Appliance Mfg. Co.*, 238 F.3d 1357, 1360 (Fed. Cir. 2001) (citations omitted).

*Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 292 (3d Cir. 1991))). Only if Plaintiff can establish its seniority through prior use of the mark does the issue of abandonment arise. 15 U.S.C. § 1127 ("Abandonment (1)").

Applying the first use test to the record while drawing all inferences in Plaintiff's favor, there is a genuine issue as to whether Plaintiff can establish priority of use in the BUCK ROGERS mark. It must be noted that it is not necessary for Plaintiff to trace its claim to the BUCK ROGERS mark back to John F. Dille or Philip F. Nowlan. Instead, Plaintiff need only point to evidence from which a trier of fact could conclude that it developed trademark rights in the mark prior to January 15, 2009.

The earliest mention in the record of the Dille Family Trust is on August 16, 1979 when it was created by Robert C. Dille and Virginia N. Dille. JA 1034. To the extent Plaintiff traces its trademark rights in BUCK ROGERS to goods and services that predate the Dille Family Trust's existence, Plaintiff points to documents that purport to show an assignment to Plaintiff of 16 trademarks (identified solely by federal registration number), and the goodwill associated with them from Robert C. Dille dated September 24, 1982, and an assignment to Plaintiff of two then-pending federal trademark applications, including one for BUCK ROGERS dated the same day. JA 1758-61. Determining whether Plaintiff succeeds to the priority of Robert C. Dille by virtue of these documents would require ascertaining what trademark rights the assignor, Robert C. Dille, had at the time of each assignment. That, in turn, would require addressing the validity and legal implications of each of the many purported trademark applications, renewals, assignments and licenses between John F. Dille, Robert C. Dille, and their respective companies that pre-date the September 24, 1982 assignment to Plaintiff.

The parties have not treated the pre-1982 assignments in any depth in their briefs, and the Court declines to do so at this juncture because it would be unnecessary to resolve Defendant's motion. Plaintiff can show that there is a genuine issue as to whether it established trademark rights in BUCK ROGERS solely with reference to evidence subsequent to the 1982 assignment.

First, there is evidence to suggest that the Dille Family Trust held federal registrations on the BUCK ROGERS mark for use with toys, publications, and games during the 1980s. JA 1767 (USPTO Certificate of Correction dated March 20, 1984 for Registration No. 1,236,497 listing "Robert C. and Virginia N. Dille . . . Trustee of the Dille Family Trust," as owner of "BUCK ROGERS [mark] for DOLLS, TOY VEHICLES AND TOY REPRODUCTIONS OF FUTURISTIC SUPPORT ENVIRONMENTS." ); JA 547-48 (Federal Registration No. 1,555,871 for BUCK ROGERS mark for use with board games, registered by the Dille Family Trust on September 12, 1989.).

Second, there is evidence of a license agreement executed September 23, 1987 between Plaintiff and TSR, Inc. ("TSR"), regarding trademark rights in BUCK ROGERS for publications and games. JA 526-34. It is well established that, the "mere granting of a license without evidence of actual use" is insufficient to establish trademark rights in a licensor. 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18:46 (4th ed. 2010) [hereinafter "McCarthy on Trademarks"] (citing *Thoroughbred Legends, LLC v. The Walt Disney Co.*, No. 1:07-CV-1275-BBM, 2008 WL 616253, at *5 (N.D. Ga. Feb. 12, 2008)). Here, however, there is evidence that TSR actually used the mark under the license. Specifically, Lorraine Virginia Dille Williams testified in her deposition that while she was the President, CEO, and majority owner of TSR from 1985-1997, TSR held a "master license" with the Dille Family Trust. AJA 7224. Pursuant to that agreement, she indicated that TSR sublicensed the BUCK ROGERS mark for

use with "games, books, electronics, art. You name it." *Id.* Her testimony is corroborated by

other evidence, including a document appearing to be a catalog of BUCK ROGERS games,

comics and books produced by TSR between 1988 and 1995. JA 1771-91. This document is

largely consistent with Williams's deposition testimony as to the nature and timeframe of TSR's

sales of BUCK ROGERS products. *Compare id.*, *with* AJA 7225-26.

Taken together, a trier of fact could reasonably conclude from the foregoing evidence that

TSR's use of the BUCK ROGERS mark for games, comics and books between approximately

1988 and 1997 was "sufficiently public to identify or distinguish the marked goods in an

appropriate segment of the public mind as those of [Plaintiff]." *Lucent Info. Mgmt.*, 186 F.3d at

315 (internal quotation marks and citation omitted). Accordingly, there is a genuine issue with

respect to whether Plaintiff established trademark rights in BUCK ROGERS through TSR's

licensed sales.[8]

If Plaintiff could establish trademark rights in BUCK ROGERS, whether through TSR's

use or that of another licensee, it would then be necessary to address Defendant's argument that

Plaintiff abandoned its trademark. "The Lanham Act states in relevant part that a 'mark shall be

deemed to be 'abandoned' . . . [w]hen its use has been discontinued with intent not to resume

such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive

years shall be prima facie evidence of abandonment.'" *Doeblers' Pennsylvania Hybrids, Inc. v.*

*Doebler*, 442 F.3d 812, 822 (3d Cir. 2006) (quoting 15 U.S.C. § 1127). The Lanham Act further

---

[8] It should be noted that Plaintiff has not moved for summary judgment as to the issue of whether it established
trademark rights through TSR's licensed use of the mark. Even if it had, Plaintiff would not be entitled to summary
judgment as to the issue because it is still disputed whether Plaintiff exercised sufficient quality control under the
TSR agreement for TSR's licensed use (and the use of its sublicensees) to inure to Plaintiff's benefit. *See Doeblers'*
*Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 823 (3d Cir. 2006) ("Ownership rights in a trademark or
service mark can be acquired and maintained through the use of the mark by a controlled licensee even when the
first and only use of the mark was made, and is being made, by the licensee." (citation omitted)). Moreover, "such
licensing arrangements are permissible so long as the license agreement provides for adequate control by the
licensor of the nature and quality of the goods or services," and the licensor actually exercises that control. *Id.*

provides that "'[u]se' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.[9] 15 U.S.C. § 1127 ("Abandonment (1)"). However, it must be noted that to make out abandonment, the Defendant has a heavy burden. *See U. S. Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 138-39 (3d Cir. 1981) ("[A]bandonment, being in the nature of a forfeiture, must be strictly proved."). Because Defendant would bear the burden of proof of abandonment at trial, its motion for summary judgment on abandonment could not be granted "unless a reasonable [fact-finder] would be compelled to find its way on the facts needed to rule in its favor on the law." *El v. Se. Pennsylvania Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007) (footnote and citations omitted).

Although the record is somewhat problematic for Plaintiff, Defendant has not met its heavy burden, and so summary judgment as to abandonment is inappropriate. On June 5, 1997, the TSR license agreement was terminated. AJA 11367. From approximately 1997 to 2007, there was an agreement in effect between Plaintiff and Walt Disney Pictures ("the Walt Disney Pictures Agreement"), under which Walt Disney Pictures had the option to exploit the Buck Rogers character for film, television, and related merchandising and entertainment. JA 1795-1846. But Plaintiff concedes that Walt Disney Pictures never produced a Buck Rogers film, or for that matter, any goods or services, under the Walt Disney Pictures Agreement. Accordingly, to avoid a finding of three years of consecutive nonuse, which would be prima facie evidence that Plaintiff abandoned the BUCK ROGERS mark during the time the Walt Disney Pictures

---

[9] In addition to non-use, abandonment may also result from so-called "naked licensing," where a trademark owner fails to provide appropriate quality control. *Doeblers' Pennsylvania Hybrids, Inc.*, 442 F.3d at 823-24 (citation omitted). The rationale is that "[w]hen the trademark owner fails to exercise reasonable control over the use of the mark by a licensee, the presence of the mark on the licensee's goods or services misrepresents their connection with the trademark owner since the mark no longer identifies goods and services that are under the control of the owner of the mark." *Id.* (citation omitted).

Agreement was in effect, 15 U.S.C. § 1127 ("Abandonment (1)"), Plaintiff must rely on some other use of the mark during the 1997-2007 timeframe.

To that end, Plaintiff notes that under the Walt Disney Pictures Agreement, it retained the right to license the BUCK ROGERS mark for use with "vintage merchandising," and a "role-playing game," JA 1804-05, 1819, and contends that it continued to license the BUCK ROGERS mark for these uses. A review of the record reveals sufficient evidence for Plaintiff to establish a genuine issue as to whether it abandoned the mark during the time the Walt Disney Pictures Agreement was in effect. For example, there are: (1) documents from 2003 that reflect royalty payments Plaintiff received from the sale of 586 Buck Rogers commemorative statutes by Dark Horse Comics, Inc., with gross receipts totaling about $15,000, AJA 10269-10275; (2) records suggesting that between 2002 and 2007, Plaintiff received royalty payments from Universal Pictures for sales of the 1979-1981 Buck Rogers film and television series DVD's reflecting gross revenues during these years ranging from as much as $51,314 to as little as $192 annually, AJA 11037-11068; (3) royalty reports from Alpha International, Inc., reflecting the sale of hundreds of Buck Rogers spaceships from 2003 to 2007, AJA 10765-10803; and, (4) a purported license agreement with Hermes Press for books of reprints of the original comic strip, and distributor records suggesting that (at most) 1,914 copies were sold between December 2008 and January 2009. Although this evidence raises questions as to whether Plaintiff's claimed uses of the mark from approximately 1997 to January 15, 2009 were "made in the ordinary course of trade, and not made merely to reserve a right in a mark," 15 U.S.C. § 1127, it does not compel a conclusion in Plaintiff's favor.

Therefore, summary judgment on the issue of abandonment of would also be inappropriate.

### 2. Plaintiff's Motion

#### i. Ownership of BUCK ROGERS mark

Turning next to Plaintiff's motion for summary judgment on its challenge to the TTAB's rejection of its opposition to the Defendant's trademark application. As to the claim, Plaintiff asserts a single ground for summary judgment in its favor: Defendant cannot prove ownership of the BUCK ROGERS mark. Specifically, Plaintiff points to Section 1(a) of the Trademark Law Revision Act ("TLRA"), Pub. L. No. 100-667, 102 Stat. 3835, which provides that "[t]he *owner* of a trademark used in commerce may request registration of its trademark on the principal register," *codified at* 15 U.S.C. § 1051(a)(1) (emphasis added), arguing that Defendant's application must fail because Defendant cannot establish that it is the mark's owner.

Plaintiff's reliance on Section 1(a) is misplaced. Defendant's trademark application is not a TLRA Section 1(a) use-based application. Rather, it is a TLRA Section 1(b) intent-to-use application, which provides that "[a] person who has a bona fide intention, under circumstances showing the good faith of such person, to use a trademark in commerce may request registration of its trademark on the principal register." 15 U.S.C. § 1051(b)(1). As Defendant points out, unlike a Section 1(a) application, a Section 1(b) application does not require the applicant to be the "owner" of the mark. *See id.* Indeed, such a requirement would make no sense because the intent-to-use application provision expressly contemplates that no use has yet taken place. *Id.* Because trademark ownership in the United States is governed by priority of use, *In re Trade-Mark Cases*, 100 U.S. 82, 94 (1879) ("At common law the exclusive right to [a trademark] grows out of its *use*, and not its mere adoption . . . . It is simply founded on priority of appropriation."); *see also* 2 McCarthy on Trademarks § 16:1 ("The basic rule of trademark ownership in the United States is priority of use."), intent-to-use applicants, by definition, do not "own" the mark

they seek to register. Instead, intent-to-use applicants may perfect their applications pursuant to TLRA Sections 1(c), *codified at* 15 U.S.C. § 1051(c) (allowing amendment of intent-to-use application to conform to use-based application by an intent-to-use applicant who has used the mark in commerce), or 1(d), *codified at* 15 U.S.C. § 1051(c) (allowing filing of verified statement that trademark has been used in commerce on Notice of Allowance by the U.S. Patent and Trademark Office).

Here, unless Plaintiff can establish priority of use of the Buck Rogers mark, *see supra* Part III.A.1, it may not rely on the fact that Defendant has not yet used the mark to oppose Defendant's intent-to-use application. To hold otherwise – namely, to allow Plaintiff to rely on post-application use to enjoin an intent-to-use applicant from using the mark in commerce, and thereby, perfecting its application – "would eviscerate the [TLRA's intent-to-use] provisions and defeat their very purpose." *WarnerVision Entm't Inc. v. Empire of Carolina, Inc.*, 101 F.3d 259, 262 (2d Cir. 1996). Accordingly, Plaintiff's motion for summary judgment in its favor on its opposition to Defendant's trademark application on the ground that Defendant cannot establish ownership of the mark will be denied.

### ii. Preclusion

In addition, Plaintiff has also moved for summary judgment with respect to two of Defendant's affirmative defenses to Plaintiff's challenge to Defendant's trademark application: claim preclusion (res judicata), and issue preclusion (collateral estoppel) as to the question of abandonment. Specifically, Plaintiff contends that there is no genuine issue of material fact that would prevent the Court from concluding as a matter of law that the TTAB's February 1, 2011 order granting Defendant's cancellation petition lacks preclusive effect in the present case. Plaintiff concedes that TTAB decisions may be entitled to preclusive effect, *see B & B*

*Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1310 (2015) (addressing issue preclusion

specifically), but contends that the elements of claim preclusion and issue preclusion are not

satisfied.  Each defense is addressed in turn.

### a.  Claim Preclusion

"The doctrine of claim preclusion . . . prohibits successive litigation of the very same

claim by the same parties."  *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016)

(citation and quotation marks omitted).  Generally, "[c]laim preclusion bars suit when three

elements are present: (1) a final judgment on the merits in a prior suit involving (2) the same

parties or their privies and (3) a subsequent suit based on the same cause of action."  *Davis v.

Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016) (quotation marks and citation omitted).

Defendant seeks to use the TTAB's February 1, 2011 decision granting the Defendant's

cancellation petition − the result of which was the April 5, 2011 cancellation of the Plaintiff's

federal registrations of the BUCK ROGERS mark for newspaper comic strips and board games −

as a shield that precludes Plaintiff's instant claim opposing Defendant's trademark application.

There is little doubt that the first two elements of claim preclusion are met.  As to the first, in

light of Plaintiff's voluntary surrender, the TTAB's decision was analogous to a default

judgment, which may have preclusive effect, *see Int'l Nutrition Co. v. Horphag Research, Ltd.*,

220 F.3d 1325, 1328 (Fed. Cir. 2000) (citing cases), and thus, the TTAB's decision granting

Defendant's cancellation petition was a final judgment on the merits.  And as to the second

element, the parties are the same.

That leaves the third element, which would require Defendant to establish that Plaintiff's

present opposition to Defendant's trademark application is "based on the same cause of action"

as the earlier cancellation petition.  Where the parties have switched sides from the first action to

the second, such that it is the first-action defendant against whom the defense of claim preclusion is asserted in the second action, "the somewhat different rules of 'defendant preclusion' apply" to the determination of whether the two suits involve the same cause of action. *Nasalok Coating Corp. v. Nylok Corp.*, 522 F.3d 1320, 1324 (Fed. Cir. 2008) (citing 18 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4414 (3d ed.)); *see also Towers, Perrin, Forster & Crosby, Inc. v. Brown*, 732 F.2d 345, 348 (3d Cir. 1984) (considering Restatement (Second) of Judgments § 22 to determine whether the two suits involve the same cause of action). As relevant here, when judgment in the first action was entered against the defendant, a subsequent action by the first-action defendant "is precluded only if (1) the claim . . . asserted in the second action was a compulsory counterclaim that the defendant failed to assert in the first action, or (2) the claim . . . represents what is essentially a collateral attack on the first judgment." *Nasalok Coating Corp.*, 522 F.3d at 1324 (citing *inter alia* Restatement (Second) of Judgments § 22 (1982)).

Here, Plaintiff's present opposition to Defendant's trademark application was not a compulsory counterclaim to Defendant's cancellation petition. *See* 37 C.F.R. § 2.114 (identifying "[a] defense attacking the validity of any one or more of the registrations pleaded in the petition," as the sole compulsory counterclaim to a cancellation petition). Nor, so far as the record reveals, was the instant opposition a permissive counterclaim in the cancellation proceeding. To the contrary, Plaintiff could not have opposed Defendant's trademark application in the cancellation proceeding because an opposition to a trademark application cannot be filed until the application is published by the USPTO in the Official Gazette. 15 U.S.C. § 1062(a). Publication of Defendant's trademark application occurred June 14, 2011, more than two months after Plaintiff's federal registrations were cancelled. Consequently, it would not have been

possible for Plaintiff to assert its opposition to Defendant's trademark application as a counterclaim to Defendant's cancellation petition because such opposition would have been purely hypothetical, and as such, untimely. Because Plaintiff could not have opposed the Defendant's trademark application in the cancellation proceeding, asserting it here is not a collateral attack on the TTAB decision granting the cancellation petition. Accordingly, Plaintiff's opposition in Count One is not "based on the same cause of action" as the cancellation proceeding.

Thus, claim preclusion based on the TTAB's decision in the cancellation proceeding is unavailable, and Plaintiff's motion for summary judgment as to the affirmative defense of claim preclusion will be granted.

### b. Issue Preclusion

When "the usages adjudicated by the TTAB are materially the same as those before [a] district court," prior TTAB decisions should be given preclusive effect "[s]o long as the other ordinary elements of issue preclusion are met." *B & B Hardware, Inc.*, 135 S. Ct. at 1310. Issue preclusion is available where "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment." *Peloro v. United States*, 488 F.3d 163, 174-75 (3d Cir. 2007) (citations, quotations marks, and alterations omitted).

Here, Defendant contends that Plaintiff is precluded from contesting the issue of abandonment, which, Defendant asserts, was finally resolved in its favor by the TTAB in the cancellation proceeding. Defendant's argument is without merit. With respect to the first element, the issue sought to be precluded is not the same. Although, broadly speaking, both

involve whether Plaintiff abandoned the BUCK ROGERS mark, in the cancellation proceeding the question was whether Plaintiff had ceased to use the mark for the goods covered by its federal registrations, specifically newspaper comic strips and board games. Here, Plaintiff asserts that it has common law trademark rights in a much wider range of goods and services, and as such, the question is whether Plaintiff has abandoned use of the mark for all of those uses.

Nor is the second element met – although the cancellation proceedings lasted 15 months, the issue of abandonment of the mark was not resolved on the merits, but rather, by Plaintiff's voluntary surrender of its federal registrations. Nor, therefore, was the fourth element met: what was not actually determined cannot constitute a determination essential to a prior judgment. Accordingly, Plaintiff's motion for summary judgment as to Defendant's affirmative defense of issue preclusion will also be granted.

### B. Lanham Act Trademark Dilution – Count Three

Returning to Defendant's summary judgment motion, Defendant next seeks summary judgment as to the Plaintiff's federal trademark dilution claims. Plaintiff's Second Amended Complaint includes two federal trademark dilution claims: its stand-alone federal trademark dilution claim based on the Defendant's 2015 conduct (Count Three), and its opposition to the Defendant's application to register the BUCK ROGERS mark on dilution grounds (Count One) (collectively, "federal dilution claims"). Both are governed by Section 43(c) of the Lanham Act, which provides that "the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark . . . in commerce that is likely to cause dilution by blurring . . . ." 15 U.S.C. § 1125(c). A prima facie federal trademark dilution claim thus requires proof that: (1) that the plaintiff is the owner of a mark that

qualifies as a "famous" mark in light of the totality of the four factors listed in 15 U.S.C. §

1125(c)(2); (2) the defendant is making commercial use in interstate commerce of a mark or

trade name; (3) the defendant's use began after the plaintiff's mark became famous; and (4) the

defendant's use is likely to cause dilution by lessening the capacity of the plaintiff's mark to

identify and distinguish goods or services.  *See* 15 U.S.C. § 1125(c)(2); *Times Mirror*

*Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 163 (3d Cir. 2000).[10, 11]

Defendant argues that Plaintiff cannot establish the first element on the summary

judgment record, contending that it contains insufficient evidence that Plaintiff owns the BUCK

ROGERS mark and that BUCK ROGERS is a famous mark.  Additionally, Defendant argues

that Plaintiff cannot establish the third element because it cannot prove that Defendant's

challenged use took place after BUCK ROGERS became a famous mark.  Because the issue of

fame is clearly dispositive of Plaintiff's dilution claims, the Court will confine its discussion to

the issue of whether BUCK ROGERS is a famous mark.

---

[10] *Times Mirror* preceded the Trademark Dilution Revision Act of 2006 ("TDRA"), which expanded the Lanham Act to include claims alleging *likelihood* of dilution, rather than only claims alleging actual dilution, and amended Section 43(c) to reduce the number of statutory fame factors from eight to four. Pub. L. No. 109-312, 120 Stat. 1730 (2006), *codified at* 15 U.S.C. § 1125(c).  The elements of a dilution claim articulated in *Times Mirror* have thus been modified above to integrate changes effected by the TDRA.

[11] The parties have not addressed whether the challenged use – Defendant's 2015 pitch of a BUCK ROGERS script to NBC Universal – would be competitive or noncompetitive with Plaintiff's asserted uses.  The record does not resolve the issue because so many factual disputes remain as to whether Plaintiff can establish priority of use of the BUCK ROGERS mark, and if so, the particular goods and services for which Plaintiff has in fact used the mark.  As Professor McCarthy has noted, despite its facial applicability to competitive situations, *see* 15 U.S.C. § 1125(c)(1) (providing injunctive remedy for likelihood of dilution "regardless of the presence or absence of actual or likely . . . competition"), the legal theory of dilution by blurring only makes sense in non-competitive contexts. 4 McCarthy on Trademarks § 24:74, at 226-28, and n.7 (4th ed. 2010) (citing *inter alia TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 95 (2d Cir. 2001) ("In contrast [to traditional infringement law], the Dilution Act is designed solely for the benefit of sellers.  Its purpose is to protect the owners of famous marks from the kind of dilution that is permitted by the trademark laws when a junior user uses the same mark in a non-confusing way *in an unrelated area of commerce*." (emphasis in McCarthy on Trademarks)).  Because there is evidence in the record to suggest that Defendant's use of the mark for the script could be noncompetitive with Plaintiff's use of the mark on, for example, books of reprints of the original newspaper comic strips, the Court will assume without deciding that a federal dilution claim is proper here.

For the purposes of federal trademark dilution, fame is truly a threshold question, and "[i]t is well-established that dilution fame is difficult to prove." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012) (holding that evidence was insufficient to establish COACH mark used with handbags and leather goods met fame threshold for federal dilution claim). A mark is famous, "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). In light of this language, and considering the sweeping scope of the federal dilution remedy, Professor McCarthy has proposed as a guideline a general threshold of 75% recognition to qualify as a famous mark. 4 McCarthy on Trademarks § 24:106 *Author's Opinion on Amount of Consumer Recognition and Awareness to Qualify a Mark as "Famous."*

Although the Third Circuit had interpreted an earlier version of the federal trademark dilution law to allow the owner of a mark that had attained "niche fame" in a specific geographic area or among a particular subset of consumers to benefit from federal dilution protection, *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 164-65 (3d Cir. 2000), commentators and courts generally agree that the 2006 addition of the definition of a famous mark by the TRDA, Pub. L. No. 109-312, 120 Stat. 1730 (2006), *codified at* 15 U.S.C. § 1125(c), effectively precludes niche fame from serving as a basis for a federal dilution claim. *See* 4 McCarthy on Trademarks § 24:105 at n.4 (collecting cases).

Under the TRDA, the question of whether a mark is famous is informed by "all relevant factors," including four permissive statutory considerations:

> (i) [t]he duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (ii) [t]he amount, volume, and geographic extent of sales of goods or services offered under the mark; (iii) [t]he extent of actual recognition of the mark; [and,] (iv) [w]hether the mark was [federally] registered . . . .

15 U.S.C. § 1125(c)(A)(i)-(iv).

Here, Plaintiff's principal evidence of fame is the testimony of Richard A. Spreng, Ph.D.,[12] who conducted a survey designed to shed light on the third factor, the extent of actual recognition of the mark. ECF 92. Based upon the survey, Spreng would testify that "there is a very high level of awareness of 'Buck Rogers'" in the United States, and that Buck Rogers "therefore is a famous mark." *Id.* at 3. Because of its centrality to Plaintiff's federal dilution claims, the Spreng survey merits some discussion.

Spreng used a private sample provider, which sent an email invitation to a representative sample of U.S. residents. *Id.* 4-5. Survey recipients – selected from a proprietary "panel" of pre-screened individuals maintained by the provider – were directed to a link to a website, where they could complete the survey. *Id.* Data were collected between February 10 and February 12, 2017, with 1,088 responses received. *Id.*

The survey included five questions. *Id.* The first tested for "unaided recall of Buck Rogers." *Id.* at 5-6 ("Over the years there have been many science fiction action characters. In the spaces below, please name all the science fiction action characters you can think of."). A mere 1% of respondents included Buck Rogers in the first five (of ten) boxes provided; when narrowed to exclude characters that Spreng determined where not "science fiction action characters," that number increased to 2%. *Id.* at 6-7, 16. The second question tested for "aided recall of Buck Rogers," which presented respondents with a list of science fiction action characters (and one made-up name to test for "acquiescence bias"), and asked them to select any that they recognized. *Id.* at 6-7. In response, 63% of respondents indicated they recognized Buck Rogers. *Id.* For comparison, 91% indicated they recognized Captain America, and 87% indicated they recognized Luke Skywalker; on the other hand, 5% indicated they recognized the

_____

[12] Spreng is an Associate Professor of Marketing at Michigan State University, and is an independent marketing research consultant. In addition to teaching graduate level courses in research methods, he has conducted marketing studies for numerous public and private groups, and has been extensively published in the field.

made-up "Frederick Johnson." *Id.* Finally, the third question presented respondents with the same list of characters and asked "[h]ow familiar are you with the following Science [sic] fiction characters?" and asked them to rank each character on a scale from 1 (least familiar) to 5 (most familiar). *Id.* at 12. Buck Rogers had an average familiarity of 3.06, evincing less familiarity than Luke Skywalker (4.22), Captain America (4.01), Captain James T. Kirk (4.00), and Flash Gordon (3.51), and more familiarity than John Carter (2.44), Hal 9000 (2.39), The Doctor (2.37), Robbie the Robot (2.32), Klaatu (1.89), Magnus Robot Fighter (1.71), Anthony Rogers (1.68), Dr. Solar (1.64), Frederick Johnson (1.64), Dan Dare (1.62), and Brick Bradford (1.62). *Id.* at 7-8.

In its Rule 702 motion, Defendant challenges the reliability and fit of the Spreng survey upon which his opinions are premised. However, it is unnecessary to address these objections because even if the Court were to conclude that Spreng's testimony was admissible under Rule 702, it would only support a conclusion that BUCK ROGERS has not reached the requisite level of fame to support a federal dilution claim. Plaintiff's survey found – at best – 2% unaided recognition, and 63% aided recognition of the science fiction character Buck Rogers. It is not necessary to accept Professor McCarthy's threshold of 75% recognition to observe that Plaintiff's results fall far short of the recognition of other marks held to be famous after the TRDA. *See, e.g.*, *Visa Int'l Serv. Ass'n v. JSL Corp.*, 590 F. Supp. 2d 1306, 1315 (D. Nev. 2008) (holding that VISA is a famous mark in part due to survey showing 85% unaided recognition of the mark as a designation of the source of the owner's goods and services); *see also* 4 McCarthy on Trademarks § 24:106, *Author's Opinion on Amount of Consumer Recognition and Awareness to Qualify a Mark as "Famous,"* at n.18 (collecting cases).

Nor is the other record evidence sufficient to establish that BUCK ROGERS is a famous mark.  To establish the first factor, "[t]he duration, extent, and geographic reach of advertising and publicity of the mark . . . ," Plaintiff points to "numerous museum shows," including one that ran from 1996-2003 at the Smithsonian National Air & Space Museum featuring Buck Rogers memorabilia.  JA 1113.  Plaintiff also points to the inclusion from 2003-2008 of a book of Buck Rogers comic strip reprints and other Buck Rogers memorabilia in the monthly catalog circulated by the world's largest comic book distributor with a circulation of approximately 40,000 nationwide. AJA 8313-14.  The record does not, however, include advertising expenditures or other evidence to show the reach of advertising efforts by Plaintiff or its licensees during a relevant time period.  On the whole, this factor is, at best, neutral.

With respect to the second factor, "[t]he amount, volume, and geographic extent of sales of goods or services offered under the mark," Plaintiff points to the following evidence its royalties received between 2002 and 2007 from Universal Pictures for the 1979-1981 Buck Rogers film and television series.  These were not substantial, reflecting gross revenues during these years ranging from as much as $51,314 to as little as $192 annually.  AJA 11037-11068.  Plaintiff also points to royalties from the sale of Buck Rogers commemorative statutes in 2003 by Dark Horse Comics, Inc., with gross receipts totaling about $15,000.  AJA 10269-10275.

Although other goods are referenced in the record, Plaintiff has not identified, nor has the Court found, corresponding evidence from which the amount, volume or geographic extent of sales of such products may have been.  For example, there is evidence that the Dille Family Trust received fees in the amount of $220,000 from various entities between July 20, 2007 and December 18, 2008, pursuant to various licensing agreements allowing for the sale of BUCK ROGERS merchandise.  JA 2214.  However, these fees appear to correspond to up-front

licensing fees for the use of the mark, and not to "sales of goods or services offered under the mark." Although these licensing agreements provide for the payment of royalties calculated as a percentage of actual sales, the record does not include records of corresponding royalty payments or other evidence of actual sales of licensed goods or services. On the whole, this factor weighs against Plaintiff.

Finally, with respect to the fourth factor, Plaintiff cannot point to a valid federal registration of the BUCK ROGERS mark.

In light of the foregoing considerations, there is no genuine dispute that Plaintiff is unable, on this record, to establish that BUCK ROGERS is a famous mark as required by the federal dilution laws. Accordingly, Defendant's motion for summary judgment as to Plaintiff's federal dilution claims will be granted.[13]

### C. Breach of Contract - Count Two

Defendant has moved for summary judgment on the contract claim on statute of limitations grounds.[14] However, the Court need not reach this argument, as it is clear from the summary judgment record that Plaintiff cannot establish that Defendant is bound by the contract in question.

In a contract claim, "[t]he burden is on the plaintiff to prove . . . the existence of the contract *to which the defendant is a party*." *Viso v. Werner*, 369 A.2d 1185, 1187 (Pa. 1977)

---

[13] Because Spreng's proposed expert testimony is only relevant to Plaintiff's federal dilution claims, Defendant's motion to exclude his testimony pursuant to Rule 702 will be dismissed as moot.

[14] The Court has already concluded that Pennsylvania's four-year statute of limitations on written contract claims applies to Plaintiff's contract claim. ECF 54 at 5 (citing 42 Pa. Cons. Stat. § 5525(a)(8); *see Stephens v. Clash*, 796 F.3d 281, 289 (3d Cir. 2015) (noting that federal courts adjudicating state law claims apply statutes of limitations according to the law of the state in which the court sits)). Defendant contends that even if Defendant is bound by the 1942 Release and Assignment, and even if its 2015 conduct constituted a breach, the claim accrued in March 7, 2010 when the Plaintiff, Defendant, Flame Ventures, LLC − whose principal, Tony Krantz, authored the script at issue in 2015 − were engaged in negotiations over the parties' rights in the Buck Rogers character with the Cartoon Network. JA 1316-19. If true, any claim for conduct that occurred in 2015 would be untimely.

(emphasis added).  On the motion to dismiss the Second Amended Complaint, the Court addressed the 1942 Release and Assignment, and concluded that the document could be construed to bind Theresa Marie Nowlan's "heirs, executors, or administrators."  ECF 54 at 7. Viewing the allegations in the Second Amended Complaint in the light most favorable to Plaintiff, namely, that the Nowlan Family Trust is a business trust organized under the laws of Pennsylvania, and that its current trustee is Brian McDevitt, a grandson of Philip F. Nowlan and Theresa Marie Nowlan, SAC ¶¶ 2-4, the Court concluded that it was plausible, given the standards through which the Court viewed the allegations on a motion to dismiss, that Defendant is an heir, executor or administrator of Theresa Marie Nowlan, and therefore, is bound as a successor in interest to the 1942 Release and Assignment.

Now, viewed through the prism of the standard on a motion for summary judgment, Plaintiff has not identified anything in the record that could establish that the Nowlan Family Trust is a successor in interest to Theresa Marie Nowlan.  To establish a connection between Theresa Marie Nowlan and the Defendant, Plaintiff has put forth a single piece of evidence: the proposed expert opinion Michael S. Ramage, a professional genealogist, who would testify that the living descendants of Philip F. Nowlan include Brian McDevitt (the settlor and trustee of the Nowlan Family Trust), as well as Diane McDevitt, and others who Defendant concedes may be permissible beneficiaries of the Nowlan Family Trust.  JA 3075-95.  The purpose of the Ramage report is perplexing.  Defendant does not dispute that Brian and Diane McDevitt are grandchildren of Philip F. Nowlan and Theresa M. Nowlan, and also does not dispute that other individuals identified by Ramage as descendants may be permissible beneficiaries of the Nowlan Family Trust, and so it is unclear why Plaintiff needs an expert to establish these undisputed facts.

In any event, the bare fact that Brian McDevitt is Philip F. Nowlan's and Theresa M. Nowlan's grandson is insufficient to establish, as a legal matter, that a business trust he formed is an "heir, executor or administrator" of Theresa Marie Nowlan, or otherwise a successor in interest to her obligations under the 1942 Release and Assignment. That would require evidence showing some sort of transfer of the 1942 Release and Assignment to Defendant, which is absent from the record. Nor, for that matter, is there anything to suggest that the rights and obligations under the 1942 Release and Assignment passed to Brian McDevitt: Theresa Marie Nowlan's will is not in the record, nor is that of her daughter and Brian McDevitt's mother, Helen Nowlan McDevitt. Accordingly, on this record no reasonable finder of fact could conclude that the Defendant is a party to the 1942 Release and Assignment, and so Defendant's motion for summary judgment will be granted as to the contract claim, and Defendant's motion to exclude Ramage's report under Rule 702 will be dismissed as moot.[15]

\*\*\*

An appropriate order follows.

Dated: August 25, 2017

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE, J.**

---

[15] Having granted summary judgment as to the federal trademark dilution and breach of contract claims, which are the only claims for which damages or injunctive relief are available, and the only claims for which unclean hands might serve as an affirmative defense, it is unnecessary to address Defendant's motion for summary judgment as to these issues.